Filed 5/14/13  P. v. Sykes CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TROY ALLEN SYKES,<br><br>    Defendant and Appellant. | 2d Crim. No. B238046<br>(Super. Ct. No. F448710)<br>(San Luis Obispo County) |

Troy Allen Sykes appeals the judgment entered after a jury convicted him of attempted voluntary manslaughter (Pen. Code,[1] §§ 192, subd. (a), 664), felony child abuse/endangerment (§ 273a, subd. (a)), and first degree residential burglary (§ 459). The jury also found true allegations that appellant personally used and discharged a firearm in committing the attempted voluntary manslaughter (§ 12022.53, subd. (c)), and personally used a firearm in committing the other offenses (§ 12022.5, subd. (a)).  The jury further found that an individual other than an accomplice was present in the residence during commission of the burglary (§ 667.5, subd. (c)(21)).[2]  Appellant was sentenced to 25

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Appellant was also charged with two counts of attempted first degree murder. The jury acquitted him on the count naming victim Erik Skupian and found him guilty of the lesser included offense of attempted voluntary manslaughter.  Appellant was found not guilty of both the greater and lesser offenses as to named victim Amy Amy W.

years in state prison.  He contends the trial court committed reversible instructional error and sentenced him on the burglary count in violation of section 654.  We affirm.

STATEMENT OF FACTS

Appellant and Amy W. were in a romantic relationship from 2001 until 2007.  Their son G. was born in 2006.  Amy W. obtained multiple restraining orders during the relationship due to appellant's physically abusive behavior.  After the relationship ended, appellant tried to reconcile with her and was jealous of her involvement with other men, including Erik Skupian.  On one occasion, appellant and Skupian fought after appellant grabbed Amy W. at a party.

On July 6, 2010, Amy W. was living in a condominium with G. and her 14-year-old son from a prior relationship.  That morning, Amy W. was in her condo with Skupian and a neighbor when appellant left a voicemail message stating that he needed to talk to her.  Shortly thereafter, Skupian saw appellant looking into the condo through the sliding glass door in the backyard.  Skupian told Amy W., who began locking all the doors.  At that point, appellant began calling and texting Amy W.  After confirming that appellant had dropped G. off at day care, Amy W. called the police and reported that appellant had been in her backyard in violation of a restraining order.  Later that morning, appellant sent Amy W. a text message stating, "You ruined everything.  Hope he is worth it."

Around 6:00 that night, appellant went to a friend's home and told him "he was afraid he was going to do a year in jail" for violating Amy W.'s restraining order.  Appellant said he "would rather shoot [Amy W.] instead of just go to jail for a year."  A few hours later, appellant sent his sister a text message stating, "Good-bye.  I love you.  I am done.  Last time getting screwed by Amy."  In another message, appellant asked his sister to "try to help dad raise [G.]"

At around midnight, Amy W. and Skupian were in Amy W.'s upstairs bedroom while G. was sleeping in his bedroom next door.  Skupian opened the sliding glass door to the balcony and saw appellant walking underneath the balcony with a baseball bat in his hand.  Skupian told appellant he should leave and said he was going to

2

jail.  Appellant replied, "[F]uck you.  I'm going to kill you."  Appellant pulled out a revolver and fired it at Skupian, narrowly missing his head.

Skupian told Amy W. that appellant had a gun and they both ran out of the bedroom.  As Amy W. ran into G.'s bedroom, appellant broke the backyard sliding glass door with the baseball bat and entered the condo.  Skupian ran into Amy W.'s other son's bedroom and managed to escape onto the balcony.  As Skupian was climbing over the balcony, he saw appellant in the hallway at the top of the stairs.  Skupian made eye contact with appellant, then heard a gunshot as he fell to the ground outside.  Skupian pounded on a neighbor's window but received no response.  After hearing several more gunshots and Amy W.'s screams, he ran to a nearby restaurant and called 911.

Amy W. called 911 from G.'s bedroom and blocked the closed door with her body.  Appellant managed to get into the room and hit Amy W. with the baseball bat before shooting her point-blank in the right arm.  Amy W. attempted to grab the gun away from appellant.  As she struggled with appellant, she managed to put her hands on the gun and kept firing it until she thought it was empty.  She then dropped the gun and collapsed against G.'s bed.

After appellant fled, Amy W.'s neighbors went to her condo and heard someone moaning upstairs.  They entered G.'s bedroom and found Amy W. sitting on the floor covered in blood.  G. was sitting on his bed crying and said, "daddy hurt mommy bad."  When Amy W.'s brother-in-law arrived to get G., the child was "shaking" and said he had a stomach ache.  G. told his uncle that "tonight my dad shooted my mom in the head and there was lots of blood" and "when she was on the ground, he broked her arm with a bat."

When the police arrived, appellant started waving the baseball bat and yelled, "it's me over here."  Appellant complied with orders to drop the bat, then started moving toward one of the officers.  When appellant saw Skupian coming up behind the officer, he started chasing Skupian while yelling that he was going to kill him.  Appellant was tasered after he ignored the officers' commands to stop.

3

Police investigators found a revolver with five expended shell casings on the floor in G.'s bedroom. Three bullet holes were found in the wall between G.'s bedroom and the adjacent bathroom, and there was blood spatter on G.'s bed. Another bullet hole was found in the boards surrounding the walkway to the condo.

Amy W. suffered gunshot wounds on her scalp and arm and her nose and arm were fractured. The doctor who examined her indicated she was "very fortunate" not to have been killed or have suffered any serious brain or cranial injuries.

Appellant suffered a gunshot wound to his abdomen. A blood sample taken shortly after his arrest indicated a blood alcohol level of .20 percent.

Appellant testified on his own behalf. On the morning of the incident, he had custody of G. and was planning to take him to Amy W.'s house instead of day care. He called Amy W. and left a message to let her know he was coming. When he arrived at Amy W.'s condo, he walked to the back instead of going to the front door because G. told him Skupian was there. After looking through the sliding glass door and seeing that people were there, he took G. to day care and went to work. Appellant then tried to reach Amy W. by calling and texting her. Amy W. eventually sent a text message stating that she was calling the police to report he had violated the restraining order.

After leaving work at around 5:00 p.m., appellant had two margaritas at a restaurant. He then drank two 24-ounce beers as he drove to his friend's house, where he had two more cocktails. Appellant was upset because he and Amy W. had rekindled their relationship the prior weekend and he had told her he did not want Skupian around anymore. He was also upset that Amy W. was going to report a restraining order violation again.

At some point, appellant bought more alcohol and drove to his father's house. After a brief visit, he bought even more alcohol and went home. He texted back and forth with his sister and said he wanted to kill himself because Amy W. had "cheated on [him] again." His plan was to go to Amy W.'s condo and "blow [his] head off in front of her."

4

Appellant drove to Amy W.'s condo and got out of his truck armed with a revolver and a baseball bat. As he stood in the parking lot outside the condo, he "started having doubts" and "couldn't get the thought of [G.] out of [his] head." He then heard Skupian yelling that they were going to call the police. Appellant wanted to get Skupian out of the condo, so he shot up toward the balcony. He was not trying to shoot Skupian, but rather only wanted to hit the sliding glass door.

Appellant went through the front gate and broke the sliding glass door. He ran upstairs and went into Amy W.'s bedroom and then G.'s bedroom. When he entered the room he saw Amy W. "sort of like stand-sitting with her butt kind of on the edge of the bed directly in front of [him]." He did not see G. Appellant swung the bat and hit Amy W. in the arm "really hard," although it "wasn't [his] plan" to do so and he "didn't want to hurt her." As he hit Amy W. with the bat, he "heard the gun fire." Amy W. fell to the ground and appellant shot her in the shoulder. As he put the gun to his own head, he heard G. talking to him and noticed for the first time he was in the room. At that point he dropped the gun and left.

DISCUSSION

I.

*Alleged Instructional Error*

Appellant contends the court violated his federal constitutional rights to due process and a jury trial by giving jury instructions that "incorrectly defined the mental state" required to convict him of felony child abuse/endangerment under section 273a, subdivision (a). Specifically, he claims the modified version of CALCRIM No. 821 the court gave erroneously "omitt[ed] the element that requires a defendant's actual awareness of the child's presence and any other facts that would lead a reasonable person to realize that his acts would endanger and probably result in physical injury or mental suffering of the child." He argues that the instruction given on general intent (CALCRIM No. 250) is similarly infirm in that its description of the required mental state for child abuse "fails to clearly state that a conviction requires actual awareness of the facts that resulted in the mental suffering and endangerment of the child." He further claims the

5

error was prejudicial because "there was substantial evidence that appellant was not aware of [G.]'s presence until after the shots and violence occurred."[3] We are not persuaded.

"Section 273a, subdivision (a) 'is an omnibus statute that proscribes essentially four branches of conduct.' [Citation.]" (*People v. Valdez* (2002) 27 Cal.4th 778, 783.) The statute applies to "'[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . .' (§ 273a, subd. (a).)" (*Ibid.*, fn. omitted.) Violation of the statute "'can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect.' [Citation.] . . . Section 273a[, subdivision (a)] is 'intended to protect a child from an abusive situation in which the probability of serious injury is great.' [Citation.] '[T]here is no requirement that the actual result be great bodily injury.' [Citation.]" (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215-1216.)

Here, the jury was instructed pursuant to CALCRIM No. 821 that in order to find appellant guilty of violating subdivision (a) of section 273a, the People had to prove that appellant both "willfully inflicted unjustifiable physical pain or mental suffering on a child," *and* "willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering[.]" The jury was further instructed pursuant to CALCRIM No. 250 that the People had to prove the crime was committed with general

---

[3] The People contend that appellant's claims of instructional error are forfeited because they were not raised below. They rely on the proposition that a party generally cannot claim for the first time on appeal that an instruction correct in law and responsive to the evidence was either too general or incomplete. (*People v. Lang* (1989) 49 Cal.3d 991, 1024; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.) This rule does not apply here because "it is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge. [Citations.]" (*People v. Mil* (2012) 53 Cal.4th 400, 409.)

intent. As appellant correctly points out, the instructions as given were erroneous to the extent they required the jury to find appellant had violated the statute through both active and passive conduct.[4] This error, however, inured to appellant's benefit in that it compelled the People to prove more than was necessary to obtain a conviction.[5]

Moreover, the omitted element appellant purports to identify is inherent in the instructions that were given. Under those instructions, the jury had to find that appellant willfully, i.e., willingly or purposefully, inflicted unjustifiable physical pain or mental suffering on G. The jury could not have made such a finding had it not also found that appellant was aware of G.'s presence in the room when he attacked Amy W.

Appellant's reliance on *People v. Williams* (2001) 26 Cal.4th 779 is misplaced. In *Williams*, our Supreme Court concluded that while assault is a general intent crime, the jury must also be instructed that the crime "requires actual knowledge of those facts sufficient to establish that the offending act by its nature would probably and directly result in physical force being applied to another." (*Id.* at p. 784.) Although the court has also recognized the similarities between assault and felony child abuse involving direct infliction of harm in concluding the latter is a crime of general intent (*People v. Sargent, supra*, 19 Cal.4th at p. 1220), assault proscribes a much broader category of conduct. To be convicted of assault, the defendant need only willfully commit an act that is likely to result in a battery; no intent to commit a battery need be

---

**4** The form instruction correctly states that the prosecution must prove the defendant either (1) willfully inflicted pain or suffering, *or* (2) willfully caused or permitted pain or suffering. (CALCRIM No. 821.) The instruction the prosecutor submitted, however, erroneously changed "or" to "and." The prosecutor attempted to correct the error after the jury began its deliberations, but the court declined the request and explained: "I gave them the instruction that you gave me [s]o I don't really want to change it now. I don't think it's going to make a difference."

**5** Appellant also notes that the requisite mental state for the second prong of the instruction (which proscribes indirect infliction of physical pain or mental suffering) is criminal negligence, not general intent, and that no instructions on criminal negligence were given. In this context, however, appellant benefitted from the error because criminal negligence requires a lesser state of mind than general intent. (*People v. Lara* (1996) 44 Cal.App.4th 102, 107–108.)

7

proven. To distinguish the crime from mere criminal negligence, it is thus logically necessary to require a finding that the actor was subjectively aware of the underlying facts. By contrast, under the relevant prong of section 273a, the defendant must be found to have willfully inflicted unjustifiable physical pain or mental suffering upon a child. In other words, there must exist an intent to commit that particular act. (*Id.* at p. 1222 ["The actus reus for section 273a [subdivision (a)] is infliction of unjustifiable physical pain or mental suffering on a child. Hence, the scienter requirement applies to such an act"].) Such a finding is necessarily predicated on the defendant's knowledge of the child's presence.

Even if appellant could establish the error of which he complains, it would be harmless. As the People persuasively put it, "it is simply inconceivable that appellant would not have known that [G.] would be in his bedroom at that time of night." Accordingly, any error in failing to instruct the jury that appellant had to be aware of G.'s presence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Flood* (1998) 18 Cal.4th 470, 502-503.)

II.

*Section 654*

In sentencing appellant on the burglary count, the court imposed a consecutive one-year, four-month prison term plus four months for the firearm enhancement. Appellant contends that sentencing on this count should have been stayed pursuant to section 654 because the burglary was incidental to the attempted voluntary manslaughter for which he was separately sentenced. We disagree.

Subdivision (a) of section 654 provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 applies not only to a single act, but also to an indivisible course of conduct committed pursuant to the same criminal intent or objective. (*People v.*

8

*Latimer* (1993) 5 Cal.4th 1203, 1207-1209.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"Penal Code section 654 serves to match a defendant's culpability with punishment. [Citation.] Whether the provision 'applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Vang* (2010) 184 Cal.App.4th 912, 915-916.)

"[O]rdinarily, if the defendant commits both burglary and the underlying intended felony, Penal Code section 654 will permit punishment for one or the other but not for both. [Citations.]" (*People v. Centers* (1999) 73 Cal.App.4th 84, 98-99.) For example, a defendant who enters a residence in order to commit an assault has a single intent and objective and may not receive punishment for both the burglary and the assault. But under the multiple victim exception to section 654, "'. . . "even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim." [Citations.] . . .'" (*Id.* at p. 99.) "[B]urglary is a violent crime for purposes of the 'multiple victim' exception when the jury finds that, in the commission of the burglary, the defendant personally used a firearm." (*Id.* at p. 88.)

9

The trial court found that section 654 did not bar separate punishment for the burglary because appellant was pursuing separate intents and objectives when he committed the burglary and the attempted voluntary manslaughter. The court reasoned: "I think the evidence showed . . . that [appellant] was entering [the condo] initially to finish his intent to kill Mr. Skupien [*sic*]. It was a stated intent. He committed that act with the gun and, of course, he was convicted of an intent to kill Mr. Skupien [*sic*] by the jury. [¶] And then he shot at him inside and that was established by the evidence. Again, he wasn't convicted of that. He wasn't even charged with that second shooting. So that part of it is a legal issue whether that's sufficient to find two objectives. So I made the findings. We'll see."

We agree with appellant that no evidence in the record supports the court's finding he entertained separate intents and objectives in shooting at Skupian before and after appellant entered the condo. Appellant was charged in only one count for attempting to kill Skupian. Moreover, the prosecution argued that the shots appellant fired both inside and outside the condo were part and parcel of that attempt. The only reasonable inference to be drawn from this evidence is that appellant fired the first shot in an attempt to kill Skupian, then committed the burglary in order to "finish [the] job." Indeed, the court expressly so found. In this regard, this case is no different from others in which punishment for either the burglary or the attempted killing was proscribed under section 654. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 492 [section 654 barred multiple punishment for defendant who committed burglary with the intent to commit murder]; see also *People v. Mesa* (2012) 54 Cal.4th 191, 198 ["Section 654 applies where the 'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself'"].)

In asserting that section 654 did not apply, however, the prosecutor correctly argued that where there is "a burglary and a subsequent assaultive crime when

10

there's more than one victim and either great bodily injury or use of a firearm," the statute "does not preclude punishment for both the burglary and the assaultive crime against one of the burglary victims." Here, the jury expressly found that appellant personally used a firearm in committing the burglary. The jury further found true the enhancement allegation that Amy W. was present when the burglary occurred. In this regard, Amy W. was identified as a victim of the burglary. The fact that she was in her own home when the burglary occurred also makes her a victim of the crime. (*People v. Centers, supra*, 73 Cal.App.4th at p. 101.) Skupian was the sole victim of the attempted voluntary manslaughter. Because the jury expressly found there was a victim of the burglary and attendant personal firearm use who was not also a victim of the attempted voluntary manslaughter, separate punishment for both crimes is consistent with section 654's purpose of insuring that punishment will be commensurate with the defendant's culpability. (*Id.* at pp. 101-102.)

In light of our conclusion that the multiple victim exception to section 654 applies as a matter of law based on findings made by the jury, we affirm the court's section 654 ruling notwithstanding its erroneous finding that the burglary and attempted manslaughter were committed pursuant to separate intents and objectives. ""No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." . . .'" (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) There is no issue as to notice here because the

11

prosecution argued below that the multiple victim exception to section 654 applied.[6]

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

---

[6] In light of our conclusion, we need not address the People's claim that the section 654 ruling may be affirmed on the ground appellant entered the condo with the intent to kill both Skupian and Amy W.  (See *United States v. Watts* (1997) 519 U.S. 148, 157 ["[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"]; *In re Coley* (2012) 55 Cal.4th 524, 554 [relying on same].)

12

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____

Richard E. Holly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez, Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.